## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **In re:** | § § § | **CHAPTER 11 CASE** |
| **MA LERIN HILLS HOLDER, LP,** | § § | **CASE NO. 15-51424** |
| Debtor. | § § § | |
| **In re:** | § § | **CHAPTER 11 CASE** |
| **L H DEVCO, INC.,** | § § | **CASE NO. 15-51425** |
| Debtor. | § § § | |
| **In re:** | § § | **CHAPTER 11 CASE** |
| **LERIN HILLS UTILITY EASEMENT HOLDER, LLC,** | § § § | **CASE NO. 15 -51426** |
| Debtor. | § § § § | **Joint Administration Pending** |

### UNSWORN DECLARATION UNDER PENALTY
### OF PERJURY OF ANDREW S. COHEN,
### <u>RECEIVER, IN SUPPORT OF FIRST DAY MOTIONS</u>

1.     I am Andrew S. Cohen, Receiver for MA Lerin Hills Holder, LP ("Landco"), LH Devco, Inc. ("Devco") and Lerin Hills Utility Easement Holder, LLC ("Pipeco"), the debtors and debtors-in-possession (collectively, the "Debtors[1]" or "Borrowers") in the above captioned cases (the "Cases").

2.     In my capacity as Receiver, I am familiar with the current day-to-day operations, business affairs, and books and records of Debtors.  The books and records of the Debtors are in many instances incomplete and this Declaration is based on the books and records that are

---

[1] For the sake of simplicity, the term "Debtors" will be used without regard to a particular debtor entity throughout this Motion where such use would not render an inaccuracy.  Where further clarification is necessary, the name of the individual entity or entities will be used.

currently in my possession. We have outstanding requests for additional information from a number of sources.

3.    To minimize the immediate adverse effects on the Debtors of filing for Chapter 11 protection and to enhance the Debtors' prospects of a successful reorganization, the Debtors are filing a number of motions requesting various types of "first day" relief (collectively, the "First Day Motions"). I am familiar with the contents of each First Day Motion (including the exhibits and other attachments thereto), and I believe that the relief sought in each First Day Motion: (i) is necessary to enable the Debtors to operate in Chapter 11 with minimum disruption or loss of productivity or value; (ii) is critical to the Debtors' achievement of a successful reorganization; and (iii) best serves the Debtors' estates and the interests of the Debtors' creditors.

4.    I submit this affidavit (the "Affidavit") in support of the First Day Motions. Except as otherwise indicated, all statements set forth in this affidavit are based upon:  (i) my personal knowledge, (ii) documents and other information prepared or collected by other members of the Debtors' management, their employees, or their professionals, (iii) my review of relevant documents, and/or (iv) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein based upon my personal knowledge, review of documents, or opinion. I am authorized to submit this Affidavit on behalf of the Debtors.

## BACKGROUND

**A.    Ownership Structure**

5.    Debtors own and/or otherwise control approximately 867 acres of real property and related improvements, generally known as the Lerin Hills residential real estate development located in Boerne, Texas (the "Property").

2

6.  The equity in Landco, a limited partnership, was owned as follows:

MALH-GP, LLC[2] was the sole general partner with a 1% ownership interest. Limited partnership interests were owned by Sequel Holdings, LLC (1%),[3] Makamah Associates, LLC (4%),[4] Joe F. Godines Investments, LLC (23.79%),[5] Petuck Capital Corp. (34.79%) and Putnam Bridge Funding III, LLC (32.5%).

7.  The equity in Devco was owned 100% by Petuck Capital Corp. Putnam Bridge Funding III, LLC ("Lender") has a contractual right to 32.5% of any distribution made by Devco.

8.  Pipeco was owned by Petuck Capital Corp. (67.5%) and Lender (32.5%).

9.  On or about April 4, 2015, after the appointment of the Receiver, Sequel Holdings, LLC, Makamah Associates, LLC, MALH-GP, LLC, Joe F. Godines Investments, LLC, and Petuck Capital Corp. tendered to PBF Lerin Hills LLC ("PBF") their equity interests in each of the Debtors. As of the Petition Date, equity in each Debtor was held as follows:

(a)  The general partner in Landco was PBF which has a .01% general partnership interest and which also owns a 67.49% limited partnership interest in Landco. Lender retained its 32.5% limited partnership interest following such tenders.

(b)  Devco is owned 100% by PBF and Lender retains its right to 32.5% of any distributions by Devco.

(c)  PBF has a 67.5% membership interest in Pipeco and Lender retains a 32.5% membership interest in Pipeco following such tenders.

**B.  Pre-Petition Financing**

10.  On or as of June 28, 2012, Devco and Lender entered into that certain Devco Loan Agreement, dated June 28, 2012 (as amended thereafter, including as amended and restated pursuant to the Amended and Restated Devco Loan Agreement, dated February 7, 2014, the "Devco Loan Agreement"), pursuant to which Lender agreed to make certain loans to Devco. To

---

[2] On information and belief, MALH-GP, LLC is owned and controlled by Petuck Capital Corp. Also on information and belief, Petuck Capital Corp. is owned and controlled by Stephen Petuck.
[3] On information and belief, Sequel Holdings, LLC is owned and/or controlled by Phil Milton.
[4] On information and belief, Makamah Associates, LLC is owned and/or controlled by Peter Tzelios.
[5] On information and belief, Joe F. Godines Investments, LLC is owned and/or controlled by Abel Godines.

further evidence the Devco Loan, Devco executed and delivered to Lender a Secured Promissory Note, dated June 28, 2012, payable to the order of Lender in the original principal amount of $5,419,963.00, bearing interest and being payable as therein provided.

11.     On or as of June 28, 2012, Lender and Landco entered into that certain Landco Loan Agreement, dated June 28, 2012 (as amended thereafter, including as amended and restated pursuant to the Amended and Restated Landco Loan Agreement, dated February 7, 2014, the "Landco Loan Agreement"), pursuant to which Lender agreed to make certain loans to Landco (the "Landco Loan"). To further evidence the Landco Loan, Landco executed and delivered to Lender a Secured Promissory Note, dated June 28, 2012, payable to the order of Lender in the original principal amount of $6,819,000.00, bearing interest and being payable as therein provided.

12.     On or as of June 28, 2012, Lender and Pipeco entered into that certain Pipeco Loan Agreement, dated June 28, 2012 (as amended thereafter, including as amended and restated pursuant to the Amended and Restated Pipeco Loan Agreement, dated February 7, 2014, the "Pipeco Loan Agreement" and, together with the Devco Loan Agreement and the Landco Loan Agreement, the "Loan Agreements"), pursuant to which Lender agreed to make certain loans to Pipeco (the "Pipeco Loan" and, together with the Devco Loan and the Landco Loan, the "Loans"). To further evidence the Pipeco Loan, Pipeco executed and delivered to Lender a Secured Promissory Note, dated June 28, 2012, payable to the order of Lender in the original principal amount of $1,962,125.33, bearing interest and being payable as therein provided.

13.     Repayment of the obligations under the Loan Agreements is secured by, among other instruments, a Deed of Trust, Collateral Assignment of Rents, Security Agreement, Financing Statement, and Fixture Filing (the "Deed of Trust") of even date therewith executed by

4

Devco and Landco for the benefit of Lender, encumbering, among other assets, the Property, as more particularly described in the Deed of Trust.

14.     To guarantee the obligations under the Loan Agreements, each of the Borrowers entered into a Guaranty, Pledge, and Security Agreement (the "Cross-Guaranty Agreement"), dated June 28, 2012. Pursuant to the Cross-Guaranty Agreement, each Borrower guaranteed the full, prompt, and unconditional repayment of all of the Borrowers' obligations under the "Loan Documents."[6]

15.     Repayment of the Borrowers' obligations under the Loan Agreements was further supported by Limited Recourse Guaranty, Pledge, and Security Agreements (the "Limited Guaranties"), dated June 28, 2012 by Sequel Holdings, LLC ("Sequel"), Makamah Associates, LLC ("Makamah"), Joe F. Godines Investments, LLC ("Godines Investments"), and Petuck Capital Corp. ("Petuck") (collectively, the "Limited Guarantors") in favor of Lender, pursuant to which each Limited Guarantor pledged its respective equity interests in one or more of the Borrowers to secure the repayment of all obligations under the Loan Documents.

16.     Collectively, pursuant to the Loan Agreements, the Deed of Trust, the Cross-Guaranty Agreement, and the Limited Guaranties, Lender was granted a first-priority security interest in and lien on (i) all of the Borrowers' then owned or thereafter right, title, and interest in and to all property and (ii) the Limited Guarantors' equity interests in each of the Borrowers (collectively, and as defined more precisely in the Loan Documents, but specifically excluding any such equity interests tendered to Lender on or as of the date of this Order, the "Collateral").

---

[6] The Loan Agreements (as amended and restated), the secured promissory notes, the Deed of Trust, the Cross-Guaranty Agreement, the Limited Guaranties, and all other documents executed in connection with the Loans (as more fully defined in the Loan Agreements as the "Devco Transaction Documents," the "Landco Transaction Documents," and the "Pipeco Transaction Documents," are collectively referred to herein as the "Loan Documents."

17.     Of the initial approximately $17.5 million in financing provided by Lender to Borrowers in 2012, approximately $6.76 million was to be used by Landco to refinance existing debt of the Borrowers, approximately $2.5 million was to be used by Pipeco to finance on behalf of the Lerin Hills Municipal Utility District (the "MUD") the cost to build a water transmission pipe to convey water from the Guadalupe-Blanco River Authority ("GBRA") to the Property, and the approximate $8.3 million remainder was to be used by Devco to construct road, utilities, and other infrastructure on the Property.

18.     Borrowers represented to Lender in 2012 that $8.3 million would be sufficient to get to a "first closing" on building lots on the Property, which would create additional funding to enable Devco to complete the first phase of development.

19.     In 2013, Lender learned that the Borrowers had experienced a material shortage of capital requiring additional advances of approximately $13 million. Consequently, the Borrowers were left with no capital from any source, and would require significant additional funding to get the Property to a "first closing" on building lots with home builders.

20.     This triggered material breaches of various provisions of the Devco Loan Agreement, including Devco's representation and warranty to Lender in Section 5.7 of the Devco Loan Agreement that loan proceeds would be sufficient to complete development of the Property, and Devco's representation and warranty to Lender in Section 5.20 of the Devco Loan Agreement that all factual information supplied by Devco to Lender in connection with the loan transactions would be accurate and not omit any material facts that would render it misleading.

21.     Lender agreed to provide another approximately $13 million (the "Additional Financing") to enable Devco to get the development to a first closing, which was memorialized in the February 2014 amendments and restatements to each of the Loan Agreements. In addition,

Devco executed and delivered to Lender an Amended and Restated Secured Grid Promissory Note payable to the order of Lender in the original principal amount of $23,078,143.08, bearing interest and being payable as therein provided.

## C.    Events Leading to Appointment of Receiver

22.    Subsequently, Devco failed to provide Lender with an amended budget to cover the six-month time period after the previously approved budget expired on August 7, 2014, as required by Section 6.1(e) of the Devco Loan Agreement. The Borrowers also failed to obtain water service to the Property, including by way of a contemplated "wheeling agreement" with the City of Boerne pursuant to which the Borrowers contemplated that Devco would obtain temporary water service from the City of Boerne until such time as GBRA water service could be extended to the Property. Other agreed milestones at the Property have not been met, including completion of a sanitary sewage and re-use system, completion of a gas line, final platting, completion of the streets and entrance to the Property, and completion of work within the adjoining right-of-way of Highway 46 in accordance with TxDOT requirements. This further delayed the "first closing," the purchase of any lots, and has left the Borrowers without any cash flow or means to fund their operations.

23.    Lender has asserted claims for beach of numerous provisions of the Devco Loan Agreement, including, *inter alia:*

(a)    The requirement in Section 2.3(b) of the Devco Loan Agreement that Devco discuss any proposed expenses to be funded with loan proceeds in excess of $50,000 and obtain Lender's approval before incurring such expense;

(b)    The prohibition in Section 2.(3) of the Devco Loan Agreement on Devco making any disbursement of loan proceeds inconsistent with the Amended Devco Budget;

(c)    Devco's representation and warranty to Lender in Section 5.7 of the Devco Loan Agreement that the loan proceeds would be sufficient for

completion of the Property in accordance with the timeline, budget and specifications of the Devco Amended Budget;

(d)    Devco's representation and warranty to Lender in Section 5.10 of the Devco Loan Agreement that all utility services necessary for the use of the Property, including water supply, will be available at the boundaries of the Property upon completion of the work in the Devco Amended Budget; and

(e)    Devco's representation and warranty to Lender in Section 5.20 of the Devco Loan Agreement that all factual information supplied by Devco to Lender in connection with the loan transactions would be accurate and not omit any material facts that would render it misleading.

24.    Pursuant to the cross-default provisions of Section 7.1(e) of the Loan Agreements, the existence of an Event of Default under one Loan Agreement constitutes an Event of Default under each of the other Loan Agreements.

25.    On or about December 26, 2014, Lender sent to the Borrowers a Notice of Default letter (the "Default Notice"), which letter constituted notice of the occurrence of certain defaults that, if not timely cured pursuant to the Loan Agreements, would constitute Events of Default thereunder. The Events of Default identified in the Default Notice (the "Existing Defaults") were not cured by the Borrowers, and are continuing under the Loan Documents. On or about March 13, 2015, the Lender sent a letter to the Borrowers accelerating all indebtedness and obligations owing under the Loan Documents.

26.    One month after the delivery of the Default Notice, the Borrowers provided Lender with a list of accounts payable showing approximately $1.89 million in outstanding payables as of January 28, 2015. Subsequently, Lender received an updated accounts payable listing showing that total payables had increased to $2.45 million as of March 6, 2015.

27.    On or about February 4, 2015, Central Texas Water Maintenance, LLC ("CTWM"), issued a "Stop Work Notice" to the Borrowers. CTWM is the outside manufacturer and installer of the booster tank, water distribution tank, and re-use tanks and systems integral to

the installation of a permanent water supply to the Property, and currently claims it is owed in excess of $545,000.

28.     On or about February 13, 2015, one of CTWM's subcontractors, Crawford Electric Supply Company, took the first step toward perfecting a subcontactor's lien by serving a written demand for payment on Devco, Lender, and the Lerin Hills Municipal Utility District.

29.     A mechanic's or materialman's lien has been asserted against the Property in the amount of $83,112.21 arising out of unpaid work performed by Jones & Carter, Inc. under three separate contracts (the "J&C Lien").  Upon information and belief, this amount has been outstanding since December 18, 2012. The existence of the J&C Lien constitutes a breach of the representations and warranties made by Devco in Section 5.11 of the Devco Loan Agreement, the representations and warranties made by Landco in Section 5.7 of the Landco Loan Agreement, and the representations and warranties made by Pipeco in Section 5.11 of the Pipeco Loan Agreement.

30.     A mechanic's or materialman's lien has been asserted against the Property in the amount of $301,565.40 arising out of unpaid work performed by DC Civil Construction (the "DC Civil Construction Lien").  It is very questionable whether the Debtors received any value from such services.  Upon information and belief, the DC Civil Construction Lien was filed on April 13, 2015.  The existence of the DC Civil Construction Lien constitutes a breach of the representations and warranties made by Devco in Section 5.11 of the Devco Loan Agreement, the representations and warranties made by Landco in Section 5.7 of the Landco Loan Agreement, and the representations and warranties made by Pipeco in Section 5.11 of the Pipeco Loan Agreement.

31.     A mechanic's or materialman's lien has been asserted against the Property in the amount of $218,914.00 arising out of unpaid work performed by Apolinar Zepeda d/b/a Zepeda

Masonry (the "Zepeda Masonry Lien"). It is very questionable whether the Debtors received any value from such services. Upon information and belief, the Zepeda Masonry Lien was filed on April 13, 2015. The existence of the Zepeda Masonry Lien constitutes a breach of the representations and warranties made by Devco in Section 5.11 of the Devco Loan Agreement, the representations and warranties made by Landco in Section 5.7 of the Landco Loan Agreement, and the representations and warranties made by Pipeco in Section 5.11 of the Pipeco Loan Agreement.

32.    A mechanic's or materialman's lien has been asserted against the Property in the amount of $13,877.64 arising out of unpaid work performed by CMC Rebar (the "CMC Lien"). It is very questionable whether the Debtors received any value from such services. Upon information and belief, the CMC Lien was filed on April 15, 2015. The existence of the CMC Lien constitutes a breach of the representations and warranties made by Devco in Section 5.11 of the Devco Loan Agreement, the representations and warranties made by Landco in Section 5.7 of the Landco Loan Agreement, and the representations and warranties made by Pipeco in Section 5.11 of the Pipeco Loan Agreement.

33.    A mechanic's or materialman's lien has been asserted against the Property in the amount of $2,555,591.00 arising out of unpaid work performed by Rafael Rios d/b/a Rafael Contracting (the "Rafael Contracting Lien"). It is very questionable whether the Debtors received any value from such services. Upon information and belief, the Rafael Contracting Lien was filed on April 13, 2015. The existence of the Rafael Contracting Lien constitutes a breach of the representations and warranties made by Devco in Section 5.11 of the Devco Loan Agreement, the representations and warranties made by Landco in Section 5.7 of the Landco

Loan Agreement, and the representations and warranties made by Pipeco in Section 5.11 of the Pipeco Loan Agreement.

34.    A mechanic's or materialman's lien has been asserted against the Property in the amount of $688,727.54 arising out of unpaid work performed by Central Texas Water Maintenance (the "CTWM Lien"). The amount of this claim is disputed, but Receiver intends to mutually resolve this claim with Central Texas Water Maintenance. Upon information and belief, the CTWM Lien was filed on April 2, 2015. The existence of the CTWM Lien constitutes a breach of the representations and warranties made by Devco in Section 5.11 of the Devco Loan Agreement, the representations and warranties made by Landco in Section 5.7 of the Landco Loan Agreement, and the representations and warranties made by Pipeco in Section 5.11 of the Pipeco Loan Agreement.

35.    A mechanic's or materialman's lien has been asserted against the Property in the amount of $123,585.48 arising out of unpaid work performed by Holt Tex Ltd. d/b/a Holt Cat d/b/a Holt Rental Store (the "Holt Lien"). Upon information and belief, the Holt Lien was filed on April 15, 2015. The existence of the Holt Lien constitutes a breach of the representations and warranties made by Devco in Section 5.11 of the Devco Loan Agreement, the representations and warranties made by Landco in Section 5.7 of the Landco Loan Agreement, and the representations and warranties made by Pipeco in Section 5.11 of the Pipeco Loan Agreement.

36.    The Kendall County Commissioners' Court held a hearing on March 9, 2015 to consider, among other agenda items, "a Preliminary Plat for Lerin Hills Garden Home Subdivision, Unit 1A, Phase 1." Although the Commissioners' Court approved the plat, it cautioned the Borrowers that they could neither sell any buildings nor allow anybody to occupy

the buildings until both water and wastewater services were in place, and that such restriction would be included in the plat. Thus, the Borrowers may be precluded from completing arrangements with any home builder until the water supply issue is resolved.

37. The Lender has asserted that the outstanding amount due them as of the petition date of these bankruptcy cases is in an amount not less than $41.3 million, including principal, accrued interest thereon, but including all unpaid fees and expenses. Based on their existing financial records, among other financial information, the amount of Borrowers' current total debts and liabilities significantly exceeds the current market value of their assets and, accordingly, the Borrowers are insolvent.

D.    **The Receivership Proceedings**

38. On March 16, 2015, Lender filed its *Verified Original Petition for Temporary Restraining Order and for the Immediate Appointment of a Temporary Receiver* (the "Original Petition"). On April 7, 2015, the *Order Immediately Appointing Temporary Receiver and Granting Temporary Injunction* was entered in the 216th Judicial District Court in Kendall County, Texas, attached hereto as Exhibit A. On June 8, the court entered *Agreed Amended Order Immediately Appointing Temporary Receiver and Granting Temporary Injunction*, attached hereto as Exhibit B (collectively the "Receivership Order").

39. I was appointed the Receiver (the "Receiver") for the Property and all other Collateral currently held by, or in control of, Borrowers (the "Receivership Assets") and was given the authority to do any and all acts necessary to the proper and lawful conduct of the receivership.

40. The Receivership Order granted the Receiver with all powers that are authorized under § 64.031 of the Texas Civil Practice and Remedies Code and §§ 11.404 and 11.405 of the

Texas Business Organizations Code. The Receiver was authorized to take any actions necessary to the proper and lawful conduct of the Borrowers and the Property, including the following:

(a)     To take any actions necessary to identify and take complete and exclusive possession, control, and custody of and operate the Receivership Assets, including the right to open mail sent to Borrowers, to change the trade name of the business located on the Property, and the right to enter into, change, modify, or terminate existing contracts;

(b)     To take and maintain possession of all documents, books, records, papers, and accounts relating to the Receivership Assets;

(c)     To be exclusively vested with all the powers of an officer, director, manager, managing member, general partner, or other controlling person, as applicable, of each Borrower, including the power to file a voluntary petition, or consent to an involuntary petition, for relief for any Borrower under the United States Bankruptcy Code;

(d)     To retain or remove, as the Receiver deems necessary or advisable, any employee, agent, contractor, officer, director, manager, managing member, or general partner, as applicable, of any Borrower;

(e)     Take and maintain control, possession, and/or custody of (a) all instruments evidencing any note receivable, (b) all assignments and endorsements of any such note receivable, and (c) all other instruments and other assets constituting the Receivership Assets, in each case, with the Receiver maintaining control, possession and/or custody, to the extent the Receiver deems necessary, of the books, papers, information, documents, and records of the Borrowers necessary to facilitate the maintenance, preservation, management, collection and realization of the Receivership Assets;

(f)     To manage and direct the business and financial affairs of the Receivership Assets and any entity owned or controlled by the Receivership Assets, and to develop and maintain a monthly operating budget in consultation with Lender that will serve as the basis for monthly requisitions to fund operations;

(g)     To investigate and determine, in consultation with Lender, the best course of action to protect and, ultimately, maximize the value of the Receivership Assets through prudent management and development;

(h)     To direct the deposit of proceeds of the Property and other receipts of Borrowers for payment of Borrowers' obligations;

(i) To allow Lender and its agents, employees, representatives, and independent contractors to inspect the Receivership Assets and prepare the same for foreclosure by Lender or reorganization through a petition (whether voluntary or involuntary) for relief under the United States Bankruptcy Code;

(j) To consent to any lawful process by Lender to enforce its rights in the Collateral, whether through nonjudicial foreclosure, petition (whether voluntary or involuntary) for relief under the United States Bankruptcy Code, or otherwise;

(k) To use the proceeds of the Property and other receipts of the Borrowers, and to receive and use protective advances made by Lender to the Receiver at Lender's option, to pay the various costs necessary to maintain, protect, and insure the Property, or to otherwise effect the disposition and monetization of the Property, in each case either with written approval from the Lender or consistent with a budget to be agreed upon in writing by the Receiver and Lender, with all such advances increasing the obligations owing to Lender under the Loan Agreements;

(1) To engage Golden Steves Cohen & Gordon LLP and Dykema Cox Smith and, in consultation with Lender, to employ such other employees, consultants, or development or other professionals (including legal advisors) that may be necessary to provide services relating to the management of the receivership or the maintenance of the Receivership Assets, including the development of the Property,

(m) Enter into agreements relating to the administration of the Receivership Assets, including those relating to the employment of such managers, agents, custodians, consultants, investigators, engineers and accountants as the Receiver deems necessary to allow the Receiver to perform the duties set forth in this order;

(n) Obtain any necessary insurance, including errors and omissions insurance, relating to the performance of the Receiver's duties under this Order, with the costs of such insurance to be paid from the Receivership Assets; and

(o) To engage in all such actions, and exercise all the rights and duties, more fully set forth in the receivership order to be submitted in connection herewith as may be necessary or useful in preserving the Property.

41. Pursuant to the Receivership Order, the Receiver was exclusively vested with all the powers of an officer, director, shareholder, general partner, manager, managing member, or other person in control, as applicable, of each of the Borrowers, and authorized and

empowered, to the extent deemed necessary by the Receiver and was empowered to exercise all such powers of an officer, director, shareholder, general partner, manager, managing member, or other person in control of each Borrower, including the power to make all management and operational decisions for and on behalf of the Borrowers and to file a voluntary petition, or consent to an involuntary petition, for relief for any Borrower under the United States Bankruptcy Code. For the avoidance of doubt, the State Court held that nothing contained in the organizational documents of any Borrower shall be construed to limit the powers of the Receiver.

42.     The Receiver was authorized to defend, compromise and adjust such actions or proceedings in state or federal courts now pending and hereafter instituted, as may in his sole discretion be advisable or proper for the protection of the Receivership Assets and to investigate, institute, prosecute, compromise and adjust actions in state or federal court as may in his sole discretion be advisable or proper to recover Receivership Assets improperly or unlawfully held by any person, including but not limited to Borrowers.  The Receiver was indemnified and held harmless by the Receivership estate, to the extent of any equity in the Receivership Assets, for any judgment, costs, or expenses suffered or incurred by him or any of his agents or attorneys as a result of actions instituted against him or them in relation to the discharge of their duties aforesaid or in carrying out or furtherance of this Order.

43.     It was ordered that all present officers, directors, managers, managing members, and general partners of the Borrowers shall, without the need for any additional corporate documentation, be deemed to have resigned such positions effective as of the entry of Receivership Order.

44.     It was ordered that the Receiver has the authority to take custody, control, and possession of the Receivership Assets with the full power to institute any actions or proceedings

to obtain or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Assets, and all such actions can be filed in the State Court; any actions sought by creditors against the Receiver, the Receivership Assets, or that in any way interferes with the Receivership actions hereunder shall be filed in the State Court.

45.     Prior to June 8, 2015, my compensation as Receiver was $500.00 per hour. After June 8, 2015, my compensation was modified to reflect my role in managing the Debtors to $8,500.00 per week plus $500.00 per hour for any time spent in court, testifying or attending depositions or 2004 examinations.

**E.     The Municipal Utility District**

46.     On May 21, 2007, Lerin Hills, Ltd., the predecessor in interest to the Debtors (Original Developer"), entered into a Development Financing Agreement (the "MUD Development Agreement") with the MUD. Original Developer assigned its rights to the MUD Development Agreement to its then current lender pursuant to the terms of that certain Assignment of MUD Rights recorded at Volume 966, Page 152 of the Official Public Records of Kendall County, Texas (the "MUD Assignment"). Original Developer conveyed to Landco all of the rights under the MUD Assignment, including its rights under the MUD Development Agreement. Pursuant to the terms of the MUD Development Agreement, the MUD is obligated to obtain and construct public rights-of-way, easements, drainage and facility water supply, water transmission facilities and a wastewater treatment plant, and costs are to be initially paid by Debtors, subject to the MUD Development Agreement. Upon completion of construction and acceptance by the MUD, all Creation Costs and Operating Advances (as defined in the MUD Development Agreement) are intended to be reimbursed to Debtors from the proceeds of the sale of bonds, subject to various regulations governing the MUD.

47.     This right of reimbursement is a significant potential future asset of the Debtors. However, it will take significant capital (estimated to be at least $3,000,000.00) to satisfy the conditions precedent to the issuance and sale of bonds by the MUD, or any reimbursement by the MUD, plus millions of dollars of future investment that I believe will be required to bring the development to a level where it is operationally and otherwise functioning properly to allow for the sale of lots that can be conveyed to potential home builders.

**F.      Pre-Petition Negotiations**

48.     After my appointment as Receiver, I obtained an appraisal of the Property. The appraised value is significantly less than the approximately $41.3 million amount owed to Lender. Almost three years after the initial funding, the Project is still unfinished. In addition to the amounts owed to Lender, allegedly another $2.45 million is owed by Debtors (subject to a review of the ultimate allowed claims in these cases, which amount includes claims by former equity and/or affiliates, friends or business partners of former equity). To date, roads for the initial development are not completed, water service is not yet available, the wastewater treatment plant is incomplete, sewer systems are not completed, work in the right-of-way of Highway 46 is not yet complete, and the existing roadways and lots are incomplete and potentially in need of remediation. After my appointment as Receiver, I engaged an engineering firm to evaluate the status of the construction of the infra-structure done to date. On information and belief, a significant portion will have to be removed, re-constructed or is otherwise unusable. Other than Lender, there are no sources for available funds to correctly complete the initial phase of the Property sufficient to sell any lots. Absent lot sales, there is no source of revenue to repay any of the creditors.

49.     In the weeks immediately preceding the Petition Date, the Debtors received bridge loans from the Lender to pay ordinary operating expenses and additional legal costs to

administer the receivership and to prepare for these bankruptcy cases. Without additional loans, the Debtors would have run out of cash, making any transaction less attractive and valuable for the Debtors' creditors.

50.     I have negotiated a potential transaction that would provide the capital necessary to complete development of the Property, which includes a private sale of the Project to Lender (or its designee) ("Purchaser"). The transaction will be consummated pursuant to a Joint Plan of Liquidation (the "Plan"). The Plan will provide for creation of a fund of $1,000,000 (the "GUC Claim Fund") for payments to all other creditors with allowed claims. Lender has also agreed, as part of the Plan that it will not receive any payments from the GUC Claim Fund until after payment in full (without interest ) of all allowed unsecured and priority claims.

51.     The potential transaction is in the best interest of the Debtors and their creditors and equity holders. Without a transaction or alternative capital, the Debtors would not be able to complete development of the Property or make any payment to the unsecured creditors.

52.     The proposed Plan of liquidation will also provide that all equity securities in the Debtors will be cancelled, and the Purchaser or its assigns will acquire all interests of the Debtors in the Property, free and clear of all claims, interests, and causes of action. The Debtors will be able to use the proceeds from this transaction pay administrative costs, priority unsecured claims and make distributions to existing unsecured creditors. With the agreements we were able to negotiate and depending on the amount of claims which are ultimately allowed, we believe the Plan has the potential to pay non-insider creditors (other than Lender) in full (without interest).

53.     No other solicitation materials have been circulated to creditors prior to the Petition Date. As set forth herein, the Plan provides for the lesser of (a) 100% payment of

general unsecured claims or (b) their *pro rata* share of $1,000,000 dollars. All equity interests will be cancelled under the Plan.

54.     With the support of the Purchaser and the Debtors' equity holders, the Debtors believe that this transaction can be consummated through the Plan. I have spent a great deal of time negotiating with the Lender to ensure that the Plan distributions are fair and equitable, and that the Plan process may be quick and consensual among the Debtors' key constituents. Likewise, the Lender has expended a significant amount of time and expense conducting its own due diligence and preparing to close the transaction contemplated in these Cases. Subject to this Court's approval, the Purchaser has also agreed to advance up to $1,000,000 to the Debtors, as post-petition debtor-in-possession financing.

**G.     Assets and Liabilities**

55.     The primary asset of the Debtors are the Property, claims under the MUD Development Agreement, a bond in the amount of $1,477,140 which secures obligations under a P Plat with Kendall County, a certificate of deposit with Frost Bank which secures a Letter of Credit in favor of Texas Department of Transportation and certain claims and causes of action. On a consolidated basis, liabilities against the Debtors significantly exceed the value of the assets.

## THE BANKRUPTCY PROCESS

**H.     Goal of the Bankruptcy Cases and Proposed Plan of Reorganization**

56.     My goal in these bankruptcy cases is to find a buyer for the Property which has the financial ability to complete development of the Property. I have achieved that goal and the sale process by private sale to Lender that will be pursuant to a reasonable plan so that the Debtors' unsecured creditors with allowed claims can receive a significant distribution, if not be paid in full. Given the Lender's $41.3 million secured claim, and its willingness to fund the

administration of these cases and the allowed claims of unsecured creditors (all subject to the DIP Agreement and Plan of Liquidation filed with this Declaration), and the reality that the fair market value of Debtors assets are substantially less than said $41.3 million.  I am pleased that this Project can be saved.

57.    The Debtors' cash flow has always depended on loans and advances. With the exception of protection advances made by the Lender during the pendency of the Receivership, the Debtors have had no cash flow in the months leading up to the Petition Date.  Time is of the essence to consummate the transaction with the Lender and avoid incurring administrative bankruptcy expenses to the greatest extent possible.  To that end, the Debtors have agreed to seek confirmation of the Plan on a rapid (though, not expedited) timeline.

58.    As discussed further below, the Plan will be filed on or substantially contemporaneously with the Petitions. Approval within such timelines is a condition upon which the Purchaser has agreed to advance funds under the DIP Note (discussed below).  Thus, the Debtor has agreed to use their best efforts to obtain confirmation of the Plan within 45 days after the disclosure statement is approved.  This means that the Plan should be confirmed within 90 days of the Petition Date.  Under the circumstances, as discussed below, the Debtors would prefer to exit bankruptcy as soon as practicable.

## I.    First Day Motions

59.    To ensure the quick and timely consummation of the transaction with the Purchaser, in addition to filing the Plan and disclosure statement, we have also filed a number of so-called first-day motions (the "First-Day Motions"), as more fully discussed below:

## J.    Joint Administration

60.    The Debtors have filed a *Motion for an Order Directing Joint Administration of Bankruptcy Cases*.  The number of creditors and other parties in interest involved in the Debtors'

chapter 11 cases may impose heavy administrative and other burdens. I believe that joint administration of the Debtors' cases will facilitate the coordinated administration of their cases. Furthermore, I understand that joint administration of the Debtors' cases is appropriate because the Debtors intend to file with this Court such motions and applications reasonably necessary to effect a smooth process for the business during the bankruptcy and a rapid exit via a confirmed plan. Moreover, the assets and operations of the respective Debtors are intertwined and each Debtor plays an essential role in the development of the Project. As such, the joint administration of these cases, including the combining of notices to creditors of the respective estates, as well as the notices and hearings of all matters at the same time, including, without limitation, motions and adversary proceedings, will promote the economical, efficient and convenient administration of the Debtors' estates. With multiple Debtors, each with its own case docket, the failure to jointly administer these cases would result in duplicative pleadings repeatedly being filed. I believe that such duplication of substantially identical documents would be wasteful and would unnecessarily burden the Clerk of the Court.

61.     Joint administration will permit the Clerk to use a single general docket for the Debtors' cases and to combine notices to creditors and other parties in interest of the Debtors' respective estates. Joint administration will also protect parties in interest by ensuring that such parties in interest in each of the Debtors' respective Chapter 11 cases will be apprised of the various matters before the Court in all of these cases.

62.     The rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases inasmuch as the relief sought is purely procedural and is in no way intended to affect substantive rights.

63.     Subject to confirmation of the Plan, each creditor and party in interest will maintain whatever rights it has against the particular estate in which it allegedly has a claim or right. Indeed, the rights of all creditors will be enhanced by the reduction in costs resulting from joint administration. The Court will also be relieved of the burden of entering duplicative orders and keeping duplicative files. Supervision of the administrative aspects of these Chapter 11 cases by the Office of the United States Trustee will also be simplified.

## K.     Complex Case Designation

64.     We have filed a *Notice of Designation as Complex Chapter 11 Bankruptcy Cases*, which I understand from my counsel is in accordance with the General Orders of the Court. I believe this designation is warranted because the total debt in these cases is approximately $45 million. Complex chapter 11 case treatment of their cases will allow the Debtors and its bankruptcy counsel to use a limited service list, pre-schedule hearings for the next ninety (90) days while the confirmation process is ongoing, and set hearings on a more frequent basis. I believe such treatment will help the Debtors complete the contemplated reorganization in an effective and efficient manner without incurring unnecessary administrative costs.

## L.     Motion to Confirm Designation

65.     We have also filed a *Motion to Designate Receiver Pursuant to Rule 9001(5) and 11 U.S.C. § 543(d)*. 11 U.S.C. § 543 provides that a receiver is to "deliver" any and all property held by a receiver to the debtor. While I was appointed as Receiver for the Property, the Receivership Order also appointed me, in the words of one court, as the "equivalent of a new board of directors, new CEO, new President, New CFO, a debtor in possession." *In re Bayou Group, L.L.C.*, 363 B.R. 674, 682 (S.D.N.Y. 2007). Specifically, the Receivership Order provided, "the Receiver is exclusively vested with all the powers of an officer, director, shareholder, general partner, manager, managing member, or other person in control, as

applicable, of each of the Borrowers, and authorized and empowered, to the extent deemed necessary by the Receiver and was empowered to exercise all such powers of an officer, director, shareholder, general partner, manager, managing member, or other person in control of each Borrower, including the power to make all management and operational decisions for and on behalf of the Borrowers and to file a voluntary petition, or consent to an involuntary petition, for relief for any Borrower under the United States Bankruptcy Code." As such, the Debtors seek confirmation that no such "delivery" is necessary.

66.     11 U.S.C. § 543(b)(2) requires that I provide an accounting. However, as I will be supervising the preparation of the schedules and statements of financial affairs and my appointment was less than sixty (60) days prior to the Petition Date, the Debtors seek confirmation that no separate "reporting" is necessary.

67.     11 U.S.C. § 543(d) gives this court authority to find that assets may be retained in the receivership. The Debtors request that claims and causes of action against third parties remain assets of the receivership pending further orders of this court.

**M.     Cash Collateral and Post-Petition Financing**

68.     We have also filed an *Emergency Motion for Interim and Final Orders (A) Authorizing Debtors to Obtain Postpetition Financing to Use Cash Collateral; (B) Granting Liens and Providing Super Priority Claims; (C) Granting Adequate Protection to Prepetition Secured Parties; and (D) Prescribing the Form and Manner of Notice and Setting the Time for the Final Hearing*. The transaction will be consummated pursuant to an amendment to the existing prepetition loan documents. The postpetition financing will give the Debtors access to needed working capital during the course of their chapter 11 cases, and fund distributions to allowed general unsecured claims, administrative claims, and priority claims under a proposed plan of reorganization anticipated to be filed jointly by the Debtors and their existing lender.

**N.     Bank Accounts Motion**

69.     We have also filed a *Motion for Entry of Order Authorizing Maintenance of Certain Bank Account and Continued Use of Existing Business Forms and Checks*. The Debtors have one bank account at Frost Bank, which I opened after entry of the Receivership Order. Frost is an authorized depository under the U.S. Trustee's guidelines. I have been advised that upon the filing of these bankruptcy cases, the ordinary procedure is to close all preexisting bank accounts at unauthorized depositories and reopen new debtor-in-possession bank accounts at authorized depositories. Additionally, we have requested the ability to instruct our bank which payments made around the Petition Date may be honored because they are post-petition payments. Given the recent nature of this account, we believe the relief requested in this Motion is warranted.

**O.     Application for Approval of the Employment of Dykema Cox Smith as Attorneys for the Debtors**

70.     The Debtors have filed an *Application for Approval of the Employment of Dykema Cox Smith as Attorneys for the Debtors* (the "Dykema Application"). By the Dykema Application, the Debtors seek to employ and retain Dykema as their counsel, as of the Petition Date, in connection with various matters, including the Debtors' commencement and prosecution of their Chapter 11 Cases. Dykema was engaged by the Receiver as litigation and potential bankruptcy counsel. Dykema has also provided advice in connection with water issues.

71.     The employment of Dykema, as specified in the Dykema Application, is appropriate and necessary to enable the Debtors to execute faithfully their duties as Debtors and Debtors-in-Possession. Dykema has stated its desire and willingness to act as counsel in the Cases and render the necessary professional services as attorneys for the Debtors. The Debtors

have selected Dykema to provide them representation in the Cases because their expertise with bankruptcy cases of similar size and scope is well known.

72. Interim approval of the Dykema Application is necessary to avoid immediate and irreparable damage to the Debtors. If counsel's employment has not been approved, there may be some reluctance on the part of third parties who need to negotiate with the Debtors' counsel. Counsel must argue motions that relate to the Debtors' ability to pay employees for wages that were accrued pre-petition. Counsel will be involved in negotiations in connection with post petition financing. The Debtors' counsel will also be involved in discussions with utilities essential to Debtors' operations. Interim approval provides counsel with authority and legitimacy, which may be questioned if not approved as counsel. Furthermore, lack of approval on an interim basis may impact whether an attorney-client relationship exists.

**P.      Application for Approval of the Employment of Golden Steves Cohen & Gordon LLP as Special Counsel for the Debtors**

73. The Debtors have filed an *Application for Approval of the Employment of Golden Steves Cohen & Gordon LLP as Special Counsel for the Debtors* (the "Golden Steves Application"). By the Golden Steves Application, the Debtors seek to employ and retain Golden Steves as their special counsel, as of the Petition Date, in connection with various matters, enumerated in detail in the Golden Steves Application. I am a named partner in the Golden Steves law firm.

74. The employment of Golden Steves as special counsel in connection with these Cases is necessary and in the in the best interest of the estates. Golden Steves currently represents the Debtors as their real estate counsel. Such experience has resulted in Golden Steves's unique knowledge of the Debtors' business and complex related legal issues. The professional services that Golden Steves will render are necessary in that the Debtors will be

selling the Property. In connection with the reorganization, the Debtors will continue to need legal counsel to assist and advise, and, to the extent that Dykema cannot undertake an issue, a substitute counsel to step in and handle such issues if Golden Steves is able to do so.

75.     The Debtors believe Golden Steves is both well qualified and uniquely able to act as the Debtors' special counsel. The Debtors have selected Golden Steves as its special counsel to save the significant cost and time that would be required for new counsel to become familiar with, and educated about, the types of matters Golden Steves has handled for the Debtors in the past. Moreover, the functions to be performed by Golden Steves will not be duplicative of the work performed by Dykema, but rather will ensure the most economic and effective means for the Debtors to be represented herein.

76.     In my capacity as Receiver for the Debtors, I am unaware of any circumstances where Golden Steves is adverse to the Debtors.

77.     Interim approval of the Golden Steves Application is necessary to avoid immediate and irreparable damage to the Debtors. If counsel's employment has not been approved, there may be some reluctance on the part of third parties who need to negotiate with the Debtors' counsel. Counsel has been and will be involved in negotiations with Debtors' pre-petition lenders and Debtor-In-Possession financing lenders in connection with postpetition financing. Interim approval provides counsel with unquestionable authority and legitimacy, to address these important matters. Furthermore, lack of approval on an interim basis could impact aspects of the attorney-client relationship.

**Q.     Procedures for Interim Compensation and Reimbursement of Professionals**

78.     The Debtors have filed the *Motion for Order Establishing Procedures for Interim Compensation and Reimbursement of Professionals* (the "Compensation Motion"). In short, the Compensation Motion seeks the Court's approval of procedures for paying the Debtors'

professionals on a monthly basis at eighty percent (80%) of fees incurred during the period covered by the Monthly Statement and one-hundred percent (100%) of expenses incurred for the month.  These payments shall be subject to this Court's subsequent approval pursuant to section 331 of the Bankruptcy Code as part of the normal interim-fee application and the local rules of this Court.

79.     Implementation of the procedures outlined in the Compensation Motion will allow parties in interest in the case to closely monitor the costs of administration of the case, and the Debtors will be able to monitor professional expenses on a monthly basis, maintain level cash flows and implement efficient cash management procedures, while receiving the professional services that are necessary to achieve a successful restructuring of the Debtors.

**R.     Bar Date**

80.     The Debtors have filed their *Motion to Establish A Bar Date for Asserting claims Against and Interests in the Debtors* for filing proofs of claims.  It is the Debtors' goal to both quickly confirm a plan of reorganization and to make distributions pursuant to a confirmed plan. However, absent certainty as to at least the maximum amount of allowed claims, it is not possible to disclose to creditors the minimum distribution they will receive.  The Debtors are requesting a bar date which will be approximately 30 days prior to the scheduled hearing confirmation of the Plan.

**S.     Rejection of Executory Contracts**

81.     The Debtors have filed their *Motion Pursuant to 11 U.S.C. § 365 Approving the Debtors' Rejection of Certain Executory Contracts and Unexpired Leases*.  The Debtors are requesting that this Motion be set on an expedited basis such that counter-parties will be required to file proofs of claim prior to the requested bar date.

82.     Prior to the Petition Date, over multiple years of attempted development of the Project, the Debtors entered into agreements relating to the potential purchase of lots. Given the uncertainty regarding the completion of the Property and the proposed sale of the Property, the Debtors propose to reject certain agreements related to the potential purchase of lots. It is unclear whether all or any of these agreements are still executory. However, out of an abundance of caution, the Debtors seek an order immediately rejecting these agreements to avoid any issues related to whether the Debtors has an obligation to continue to attempt to satisfy or perform under these agreements, whether there could somehow be an administrative claim in connection with these agreements or whether these parties have any standing to object to or otherwise interfere with the potential sale of the Property.

83.     In addition, the Debtors seek to immediately reject contracts that were entered into with parties that were insiders or affiliates of insiders or which were entered into by insiders or affiliated insiders. The Debtors may have claims or causes of action as against such parties and, the Debtors want to avoid any assertion that they may have any further obligations to parties to such contracts.

**T.     Confirmation Scheduling Motion**

84.     We will shortly file a motion asking the Court to abbreviate the period for obtaining approval of the disclosure statement, soliciting votes for or against the plan, and setting the confirmation hearing on an expedited basis. In all, we are asking for a hearing on the disclosure statement within 30 days of the Petition Date, and a confirmation within 30 days thereafter.

85.     Because the Plan, Purchase Agreement and DIP Note are all part of a "packaged deal" with the Purchaser, and because a consummated transaction is critical to the potential for a

100% recovery by the Debtors' creditors with allowed claims, the Debtors desire an expedited closing.

**U.      Utility Motion**

86.      The Debtors have filed their *Motion for Entry of Order (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Services on Account of Prepetition Invoices and (II) Authorizing and Approving of Procedures for Providing Adequate Assurance of Post-petition Payments* (the "Utilities Motion"). In connection with the operation of their businesses, the Debtors currently utilize water service from Kendall West Utilities and electric service from Bandera Electric Cooperative ("Utility Services").

87.      As of the Petition Date, I believe that the Debtors have a "credit" with Kendall West Utilities. As additional adequate assurance of payment, a cash deposit in an amount equal to the last bill for utility service provided by each Utility Company prior to the Petition Date less the amount of any credit (the "Utility Deposits"). A list of the names and addresses of the Utility Companies and proposed Utility Deposits is attached to the Utilities Motion as Exhibit A.

88.      Uninterrupted utility service is essential to the Debtors' ability to operate and maintain its operations. Therefore, it is necessary for the Debtors to receive the relief requested in the Utilities Motion to avoid immediate and irreparable harm.

**CONCLUSION**

89.      As detailed in this Declaration, the most sensitive and complex tasks required for a successful reorganization of the Debtors have been accomplished in advance of the commencement of these chapter 11 cases. However, there are a number of first-day matters that must be addressed to get the Debtors and their creditors from "Point A" (the pre- negotiated plan) to "Point B" (the confirmed and effective plan). I believe the relief we have requested in our First-Day Motions is appropriate to achieve those goals, and that the circumstances weigh

heavily in favor of scheduling hearings on the First-Day Motions immediately, setting a hearing to consider the Disclosure Statement within 30 days or less of the Petition Date, setting a Confirmation Hearing date within 30 days thereafter, or the earliest date convenient to this Court after the expiration of the applicable notice periods, and granting such other relief as the circumstances may require to help the Debtors achieve a successful reorganization in these cases.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ day of June 2015.

_____
Andrew S. Cohen, Receiver for MA Lerin Hills
Holder, LP, LH Devco, Inc., and Lerin Hills Utility
Easement Holder, LLC, Debtors and Debtors-in-
Possession